Cases 24-5610, United States of America v. Jorge Flores 24-5626, United States of America v. Kevin Tidwell 24-5641, United States of America v. Jose Pineda Caceres Argument not to exceed 10 minutes for each appellant and 30 minutes for the appellee Counsel, you may proceed for the appellant when ready And as you begin, if you all could just remind us how much rebuttal time you have, please. Good morning. Vikesha Hood on behalf of Jorge Flores I will be using two minutes of rebuttal time. This issue presented here basically is whether or not evidence that was collected pursuant to a protective sweep should have been suppressed. It is Mr. Flores' position that the evidence at issue was the result of a search that exceeded the scope of that protective sweep. Clearly this issue revolves around the Fourth Amendment, which we know warrantless searches are impermissible unless they fall under a recognized exception. One such exception is a protective sweep under Maryland v. Bowie. And there's two types of protected sweeps. There is one when the officers are executing an arrest warrant, the officers may search without probable cause or reasonable suspicion the immediate areas where they believe somebody could be hiding. The second type of protected sweep is again when they are serving an arrest warrant, but they have to have articulable facts that a reasonably prudent officer would believe that the area to be swept harbors a dangerous individual. It is our position that this second type of protected sweep is what is involved in this case. Your client was arrested outside of the house. Do you agree that the officers could conduct a protective sweep inside of the house?  We do agree that the officers could conduct a protective sweep on the inside of the house. However, it is our position that they exceeded the scope of that sweep when they found an AR-15 style rifle in a downstairs bathroom. And then they also found, or I'm sorry, they found a drum magazine in the bathroom. And then, well actually, I'm sorry, I think the rifle was found in the bathroom and then the magazine was found in a downstairs bedroom. What's interesting is when Mr. Flores exited the residence, officers, the detective at the suppression hearing testified that after he exited the residence, somebody had closed the door. Which led them to believe that there were more individuals in the house. Now, before the officers had arrived, they had developed information that not only Mr. Flores, but two other individuals they believed to be dangerous were in the home. What's interesting is that everybody that the officers suspected was in the home, they either detained or were able to arrest that day. The two other individuals that were actually inside the home were upstairs, in an upstairs bedroom, I think hiding under a bed together. And so it's Mr. Flores' position that you had 10 officers, I think it was like 20 that responded to the scene. It was 10 law enforcement officers that entered the home. So it's Mr. Flores' position that this is effectively a full search of the home. You said something was found in the bathroom, something was found in the bedroom. In a downstairs bathroom. Right, why couldn't the officers look in those two places while looking for potential dangerous individuals in the house? Well, that's the issue that we have is that when did they get to this downstairs bedroom? Certainly once they found, I think we called them in the lower court in my brief, the two Franklins, Franklin Hernandez and Franklin Piata Caceres. Once they found them upstairs, the search should have stopped. The record is unclear what happened first. Did the officers go downstairs and search the bathroom, the downstairs bathroom and bedroom? Find the gun and the magazine and did they continue their search upstairs? Or was it something that was done simultaneously? Who bears the burden of showing that the officers exceeded the scope of a protective sweep? I think the burden is on the government to show that the search did not exceed the scope of the protective sweep. And so our position is that the government failed to show that because we don't know the order of events, the sequence of events. Had the bathroom and bedroom downstairs been searched first, then yes, we would concede that that was a legal search. But if we're talking about they go upstairs, they go downstairs, they go upstairs, they find the Franklins, they arrest them, at that point there would be no other reason to search the home. How would they not know that there were, I understand the two Franklins were upstairs, how would they not know that there are other dangerous individuals in the house without looking in those other places? They had been watching this house for two months. They had a pretty good idea of the comings and goings, so they knew that the house belonged to one of the sisters of the Franklin. I think probably two months earlier they had arrested another individual that they had believed to be dangerous. And so they knew through cell phone pings that Mr. Flores, the Franklins, they knew that they were at this house. There was no other suspect developed to be at this house. Again, they had been surveilling it, they knew the comings and goings. So they had a pretty clear idea, a pretty good idea as to who was in this house. They didn't know whether or not all three of the suspects were at the house at the same time. Certainly when Mr. Flores walks out of the house and a door shuts behind him. Now mind you, they already have the sister is out at this point. She's the first person to exit the house. Then probably about, I want to say 20 minutes later, Mr. Flores exits the house, but he leaves the door open and it shuts. So that's what gives them belief that there's more people in the home. It's our position that they knew who was in the house. So it wasn't just a general guess, oh we think somebody's in the house. They had to have known it was either Franklin Hernandez or Franklin Caceres or maybe both. Can you cite a case to us that would support your position that once officers found and arrested these two individuals that they had to at that point cease searching, that they couldn't look in other places where an individual or perhaps a dangerous individual might be located? Yes, I am relying on Mary Lou V. Bowie where they specifically say that this should be a cursory search. It should be a search for the purposes of just finding and arresting the individuals and that's it. But does it, well I guess it's all how we interpret cursory. So cursory could also include a brief search of downstairs bathroom, another bedroom, you know, places where somebody might be hiding. So I'm just wondering if there's another case beyond or other than Bowie that might be helpful to you. I don't have one today. I would just say that, again, we had 10 officers are in this house. Mr. Flores' position would be that that's maybe overkill if they're trying to effect an arrest. So we've got the 10 officers that are inside the house and then the other remaining 10 that are surrounding the house. Certainly the officers didn't go 10 at a time searching one room by room. This was in effect a full search of this vehicle, a full search of this residence under the guise of a protected suite. And it would be our position that the government did not meet its burden of proving that the protected suite, the items found during the protected suite did not fall outside the scope of that suite. I think that's my time. Good morning, Your Honors. May it please the Court, my name is Matt Gulotta and I'm appearing today for Kevin Tidwell. And I'd like to reserve two minutes for rebuttal. Today, unless the Court would like to direct me otherwise or ask questions, I'm going to focus on Issue 1 today, primarily. So as the Court would know, this case involved MS-13 and at issue were many murders and violent acts. And the case featured things such as gruesome autopsy photos, which is relevant to my argument here as to Issue 1. Mr. Tidwell challenges his convictions because the District Court did not adequately address a wave of admitted fear that swept through the panel of prospective jurors during the voir dire process. The Court treated that situation as basically a very standard bias issue. And it dismissed the jurors who made the statements and it made a very standard instruction to just set aside opinions. But fear really isn't an opinion. Fear is a physiological response. It involves self-preservation. It's fight or flight. It's not something that anyone can just switch off because a judge tells them to. Can I ask you this? The government argues that we review this particular issue for plain error. Do you agree with that? No, Your Honor. I think that abuse of discretion would apply here. The attorneys all flagged this issue regarding fear and bias to the judge. And this was discussed at length with the participation of the government. And several in the co-defendants panel argued that the taint just could simply not be cured. Implying, I think very clearly, the panel needed to be dismissed. Although the words, we move for a mistrial, were not actually used. I think that it was very clear that the judge, he ruled very definitively. He even said, to the extent anyone is moving, I'm going to deny and I'm going to give a curative instruction. Because I do think it's curable. But did you have to object after the curative instruction to say that's not sufficient? I understand that the judge said, if you're moving, I'm denying. He then gives the curative instruction. Do you have to do something after that to preserve the issue? I don't believe so, Your Honor. I think that as long as it's clear and the ruling is definitive, and the judge has clearly stated that's what he's going to do, I don't know that... I think that the policy behind flagging an issue is so the parties can discuss everything. And that's the point of objecting. So I don't think there's any difference here. The parties did fully discuss this issue and the judge made his decision. So I don't think that there's any need to do that. I haven't seen a case that suggests that either. And I haven't really found a case that says otherwise, but I think if you look at the policy considerations, it shouldn't be necessary. I guess the issue is, you know, you have a prospective juror, I think it's 140, I can't remember, but that really talks about the bias issues. And by the end, the prospective jurors at issue who say the things that we're concerned about are removed for cause. And so you have, you know, a regular panel of jurors. Is anything raised at that point once the prospective jurors are gone that you're concerned about? We have these other jurors that are in panel to let the judge know that this is still not sufficient. I guess that's what I'm concerned about from a preservation standpoint. So I don't think that there was anything, there was any objection that came after that. Not that I recall. Am I right that the district court gave multiple curative instructions at various phases, as well as a permitted questioning of the remaining jurors during the voir dire process regarding potential fears and bias and things like that? I believe there were several curative instructions. The one that I would, I don't think there's really any others that were relevant to this particular issue. And of course, this particular curative issue or curative instruction was just very basic in general, and it talked about setting aside bias. What's your understanding of the burden, the Sixth Amendment kind of proof that you would need? What could the government have done, in other words, in your view, to remediate the potential taint on the jury? Well, it's a difficult situation to remediate the taint. And it may be that the only answer is dismissing the entire panel. If fear infects three people and then you've got those jurors speaking to everyone else, then it's potentially very problematic. And the Sixth Amendment, of course, just says that the jury has to be unbiased. And it's, of course, the judge's obligation to discover that and to ensure that that's the case. So I think the jury or the judge would have had to investigate. The judge would have had to give some sort of statement about safety and security and how the jurors would remain anonymous. And the judge would not want to instill fear where none existed. So it would have to be very careful. It's a difficult situation. In the Blitch case, as I cite, the judge in that case, or at least on the first part of that case, interviewed each juror individually. I think that's where Judge Mathis's question about preservation might come back, because my understanding of our case law is that we've rejected a presumption of bias that the government has to disprove and instead have required defendants to come forward with actual bias on the jury. And what it seems to me you're suggesting is kind of a sua sponte obligation on the part of the district court to question every individual juror. And I'm not sure where that's coming from in our case law. So if you could point me to a case that you think most supports that, that would be helpful. Well, I don't know that there's a specific case in the Sixth Circuit. I don't know that I agree that there's a specific Sixth Circuit case, though, that says that you have to point to a specific juror. In fact, I don't think it would make any sense here. I think the cases cited by the United States really can be really distinguished. And I think, for example, there's one case that basically says that if there's a particular, it had to do with preemptory challenges, and there was sort of a definitive statement that sounded like it applied here, but I would argue it doesn't apply. I think voir dire just in general is designed as an investigative process to make sure the Sixth Amendment is followed. And the Sixth Amendment, of course, requires the jurors not to be biased. I'm sorry to interrupt. Am I right that here the district judge did ask the remaining prospective jurors whether they could be impartial, and they indicated that they could, and they could sit as a juror, irrespective of all these concerns? Does that make a difference? Well, he gave a very standard curative instruction, and then I think at the end of it he said, I think this is what's relevant. It says, does anyone here believe that they've been swayed by any opinion in any way that you've heard from one of the fellow members of this potential panel? Anyone feel that way? So he's asking about opinions, he's not asking about fear. And I think even if jurors were afraid, I don't know that they would answer in the affirmative to that question. And I think you're not going to have a juror, probably, especially male jurors, who might feel, you know, who might be embarrassed to admit to everyone in a huge courtroom full of people that they're afraid. I don't know that you're going to get a response there. Thank you, Counsel. You'll have your rebuttal time. Good morning, Your Honors. Travis Hawkins on behalf of Jose Pineda-Caceres. And I've asked for three minutes of rebuttal time. Your Honors, we have, Mr. Pineda has challenged an evidentiary ruling by the district court, disallowing, preventing the defendant from introducing evidence in his case that contradicted testimony from a key government witness named Hector Baca. Mr. Baca is a confessed murderer. There were three sort of what I would call, there was a triumvirate trifecta of witnesses in the case, government cooperating witnesses, who were members of this local clique of the MS-13. Hector Baca was very pivotal in the testimony. He gave about two murders for which my client was convicted. One, Liliana Rodriguez in July of 2016, and the other, Jose Alvarado-Potter earlier in April of 2016. Mr. Baca did not witness, personally witness, either of those murders, but he gave very significant details about the murders and was a key, I believe, to the conviction of my client. His testimony was pivotal. Mr. Baca got on the stand and made very sweeping comments about the fact that he was afraid, that he was afraid for his life, that people had put what they call a green light, that they put a hit on him, and that he had disavowed his loyalties to MS-13. And essentially generating the sympathies of the jury. And Mr. Pineda, through counsel, sought to introduce some testimony from two witnesses at the correctional facility in Kentucky where Mr. Baca was being housed. It very severely undercut him and his story about having abandoned MS-13 and having been a fugitive. He was afraid of a hit on his life. Mr. Baca, to wit, threatened a nurse, Cassandra Thompson, at the Davies County Jail, and another officer named James Hicks, threatening both of them to put hits, green lights, on their lives, making hand signs in front of Officer Hicks. And so the purpose, our purpose for introducing that testimony was to contradict, and what I would call impeachment by contradiction, to contradict Mr. Baca's assertion that he was afraid, that he had abandoned MS-13, he even said he couldn't speak English. These two witnesses contradicted him on all those points. And so the district judge, we had a, allowed us to proffer in the case, and we gave the testimony of both of those witnesses. And it clearly contradicts Mr. Baca on these points. And Mr. Baca, as a witness, with so much important information that he testified to, he said he was afraid to speak English. As against my client, it was important under my client's Sixth Amendment right to confront witnesses, for my client to be able to impeach Mr. Baca in every way possible. Now, the government, in its response to the appellate's brief, has said that this is, they're calling this impeachment by contradiction. And I wouldn't argue with... How is this a Sixth Amendment issue? Well, I think it's a confrontation issue, because it goes to impeach this witness. That's how I would describe it. I guess your client got to confront the witness. I mean, he's trying to call individuals in his case in chief, which I don't know how that goes to the confrontation clause. Well, it's essentially confrontation by impeachment evidence, Your Honor. That's how I would describe it. And I would, this circuit has, although it has not expressly recognized this as a creature of common law, impeachment by conviction, and there are many cases in which this circuit, and I can cite them, has allowed impeachment by contradiction. And there's U.S. v. Mark Carrion, and that side is 967 F. 2nd, 1098. Yes, ma'am. Picking up on Judge Mathis's question, the premise of your Sixth Amendment argument, as I understand it, is that this was indeed impeachment evidence. I had thought the district court rendered a finding that, in fact, the particular hand motions used and the notion of putting a hit on somebody was actually not contradictory to disavowing MS-13. So if that's what the factual findings were with respect to the probative value of this testimony, how does that affect, or what's your response to that view of the evidence by the district court? Right, Your Honor. We would suggest that that's an abuse of discretion, and that's an error. The court's conclusion that this was collateral, that the offered, proffered evidence was collateral. We would vigorously disagree, respectfully, with the district court that this was not collateral. And there are a lot of reasons why. Is that where the Sixth Amendment, like the Confrontation Clause issues toggles on and off? In other words, if we agree that it's collateral, then does this just boil down to kind of the standard 0-1, 4-0-3 analysis? I believe so, Your Honor. I think that's a fair statement. We respectfully disagree with the district court's conclusion that this testimony would have been collateral or gone to an extrinsic matter, because Mr. Baca came in and made very broad, very generalized, sweeping, assertions about having disavowed his ties, about no longer being an MS-13, about being afraid. And unfortunately, the district... His testimony about the various murders that he discussed, whether he disavowed MS-13 or didn't disavow, whether he made the alleged threats to the officers or didn't make the alleged threats. I guess I'm trying to figure out how this is germane. You're saying it's not collateral. It sort of seems collateral, whether or not he left MS-13 or didn't leave MS-13, whether he threatened the officers or didn't threaten them. That doesn't seem germane to his primary testimony about what he witnessed. Right. Well, respectfully, Your Honor, we would suggest that it was non-collateral. I hear what Your Honor is saying. All I can say is that because this individual made very sweeping generalizations about his fear and that were really all proffered to the jury for the purpose of garnering sympathy for this witness, that the fact that he was not, indeed, had not disavowed the gang was, in fact, putting corrections officers in fear for their lives and then throwing hand signs, gang hand signs. And there's plenty of testimony in the record about these gang hand signs that were being thrown. I believe, Your Honor, respectfully, that the jury could very well have had a real problem with Mr. Baca if they had heard this testimony. They would have really seen that he is not who he is telling them he is. And I believe, respectfully, that it was germane. And the judge made the comment in the ruling that he wasn't sure that these hand signs were MS-13 hand signs. But respectfully, Your Honor, how could they be anything else but MS-13 hand signs? Those were the signs. The officer couldn't identify what they were. But those were the signs this young man was throwing in the jail was MS-13 hand signs. And we would respectfully disagree with the district court and ask for a reversal and a remand. Thank you. May it please the court. Sophia Vickery for the United States. Unless the court has a different preference, I thought I would just cover the issues in the same order that they were just presented. So the suppression issue, the voir dire issue, and then this extrinsic evidence issue. So with respect to the suppression argument raised by Mr. Flores, I wanted to just situate the court briefly. Mr. Flores was convicted of a RICO conspiracy, a drug conspiracy, Vicar and 924C counts related to five shootings, a felon in possession charge, and then another felon in possession charge and drug charge. It's only those last two counts that I understand that he's challenging with respect to the evidence that was recovered from the residents at Priest Woods. I also understand on appeal that the argument has narrowed substantially to just the scope of the protective sweep. This is a new argument, this distinction between the upstairs and downstairs. Before the district court, Mr. Flores argued that evidence found on one of the Franklin's should be suppressed and that the protective sweep itself was not justified. So this specific argument, the government believes to be waived. Even if the court were to consider it, the distinction between the upstairs and downstairs is a red herring. There's nothing in the facts that suggests that the person or the persons who might be lurking in the residence, posing a danger to the officers, would necessarily have been in the upstairs versus the downstairs. About this argument that I heard from counsel that there had been surveillance on the property and suggesting that the Franklin's were kind of the full extent of other potentially dangerous individuals, was that raised below? It was not raised below, and I don't recall that being in the record. What I recall is that the officers had a tip that he, Mr. Flores, might be associated with one of the Franklin's or other dangerous MS-13 members, which is one of the reasons they were afraid of who else might be in the house. But I don't understand that that was limited only to that person or that they had some kind of reasonable belief that those could be the only people in the house. In fact, someone else is the one who answered the door. They didn't know who closed the downstairs door after Mr. Flores had exited. So that's not a fact that I think would change the analysis. Assume that they believe that there are only two people in the house, dangerous people, and they found those two. Would the protective suite have to stop at that point? I guess other than the other person who also had exited earlier. I don't think it would have to stop at that point, and I'm not sure what facts would be in the record to support that. There's also not, because this issue wasn't developed below evidence in the record as to the timing of when the Franklin's were arrested vis-a-vis when, I don't know if it was those same officers or other officers saw items in plain view. There's also no dispute that the items that were found in plain view were found where a person could have been hiding. So it's not this thorough search of the house. It was the sweep to seek individuals who might be hiding in the house. I also wanted to note the good faith exception that Mr. Flores hasn't challenged either in the brief or counseled today. That would certainly cover the warrant that was ultimately issued to get the items that were seized. I'm sorry, go ahead. Would the good faith exception apply to the initial protective sweep? No, but the items that were seized were seized pursuant to a warrant, and some of the facts in the affidavit for that warrant were that they had seen the items in plain view. So even if perhaps the initial protective sweep arguably exceeded the scope, it was conducted in good faith within what a reasonable officer might perceive to be the scope of the protective sweep, and the subsequent warrant would then be covered by the good faith exception. You're relying on the good faith exception. Are you separately arguing that the contents of the warrant, if you were to pull out what was in plain view during the initial protective sweep, would still be adequate basis to search the home? That's not an argument that we put in our brief, and it was advanced below, but we didn't put that in our brief on appeal. If the court has no further questions on that, I would just turn to the voir dire issue. So what the district court did here was more than adequate, especially under plain error, which we do think applies to this scenario. After the initial perspective juror made these relatively mild comments about MS-13, the parties in the district court held a sidebar, and they discussed in that sidebar a path forward. They then agreed that what should happen is that the defense counsel who was conducting the voir dire should continue to see if anyone else shared the view of that initial perspective juror, and then that the district court should give a curative instruction. And that's exactly what happened. Defense counsel continued to ask questions along the lines of these views of MS-13. Two other perspective jurors kind of raised their hands and said, I share these views. All three perspective jurors who said that they shared their views were dismissed. Subsequent questions confirmed that no one else in the veneer, no other perspective jurors shared those views, and the district court found that clearly credible. A district court's interpretation of that scenario and answers from the jury is entitled to deference. The district court is the one in the room who's checking sort of the pulse of the jurors and the credibility of those answers. As I understand counsel's argument, it's that I guess that a curative instruction somehow just could not remove the taint here. That it was so serious and concerning that even though the three jurors who expressed a concern were removed, that this taint was just so strong that it could not be removed. And I guess the district court should have gone back to square one, a whole new jury veneer. I guess I would say it wasn't just the curative instruction, right? There were also questions checking with all of the other jurors that they did not share the views. So I guess to follow that argument, you would have to assume that they're all lying, or at least some of them are lying. And then also that the curative instruction wasn't sufficient. And I would add that nobody said, and this sort of goes back to our plain error argument, none of defense counsel said, this isn't enough to check for the fear component. We need to ask more questions, or we need to ask different questions, or we need to poll them individually. None of that came up, in fact. Counsel for Flores, who was kind of leading these questions, said, I'm good with it. I'm good with this plan. And they all proceeded on. We were just alluding to the curative instructions, which I was just going to cover next, that those instructions told the jurors, decide this case on the facts and the law as they are presented, set aside all of these other opinions or views you might have, and we assumed that the jurors were able to follow those instructions. I will proceed to the Pineda-Carceres argument, unless there are more questions there. Let me ask, at what point would the defendant have had to object to preserve their argument? We know we have the district court at some point saying, to the extent there is a motion, it's denied in discussing the curative instruction. So at what point would the defendant have to do this? I think the best place to object would be when there were additional questions, so that it could be addressed and discussed what additional questions or different kinds of questions should be asked. But there could be, I'm not sure, technically for preservation, perhaps there could have been an objection when the jury was impaneled. Perhaps there could have been an objection when the verdict was returned. But there were no objections at any of those times. The only objection came at the very beginning, before the parties discussed this path forward and before all of these additional steps were taken by the district court and by defense counsel to make sure that all of the prospective jurors who remained in the panel would be unbiased. So turning to the Pineda-Carceres argument, under any theory of admission, the evidence here would have needed to be impeachment evidence. And the district court found that it wasn't. So the district court heard a proffer from the jail employees, and this proffer addressed conduct, Baca was a cooperating witness, and it addressed conduct that he had done in jail in 2022, where he'd gotten in these verbal altercations with jail employees about receiving medication or moving jail cells. So the jail employees provided this proffer and testified that he had a couple of hand gestures, a closed fist, and a gun signal, I guess, and also had said that he wanted to kill one of them and get a hit on that employee. But the district court found that there was no connection between those hand gestures, generic hand gestures, and this statement about getting a hit to MS-13, which was, I guess, the basis for why this could possibly be impeachment. There's also no connection between whether in 2022 Mr. Baca's feelings about MS-13 to the trial testimony, which was about the sequence of events that occurred primarily in 2016 and 2017. So this did not have any impeachment value. Even if it had, any error would have been harmless. So Mr. Baca's testimony as it related to Pineda-Caceres was primarily about two separate shootings. So one was the murder of Mr. Potter in a field. Mr. Baca relayed a co-conspirator statement ascribing responsibility for that to Pineda-Caceres, but another shooter who was on the scene and cooperated gave a first-hand account that Mr. Pineda-Caceres was there, and another cooperator also testified to the same admissions. There was also ample physical evidence that Pineda-Caceres was there, so Mr. Baca's testimony was not sort of critical to that conviction. The other murder that he relayed co-conspirator statements about was the murder of Liliana Rodriguez after her 18th birthday, leaving a club. But two other conspirators, again, also provided the same testimony that Mr. Pineda-Caceres was upset that he had shot a woman, which was against MS-13 rules, and was afraid of being punished by the gang. One of the other cooperators also testified about giving Pineda-Caceres the gun, where the casings at the scene matched the gun that he had been given. And then he also testified that he had buried that murder weapon at Pineda-Caceres' direction. So there was overwhelming evidence of his participation in these murders, regardless of the testimony of Mr. Baca. I didn't have anything else unless the Court had other questions. Thank you. I'm going to catch your head for a rebuttal on behalf of Mr. Flores. The issue here is that our argument is that the government failed to prove that the search and the subsequent items that were found were legal pursuant to a protected suite. That was the issue that was argued at the District Court, and it's the issue that we have brought today. Again, when this type of issue is raised, the burden is on the government to prove that the search was legal, or that the search fell under an exception to the Fourth Amendment. And here, the government did not meet that burden. We don't know the order in which these rooms in the house were searched. We do know that law enforcement officers had been sitting on this house for two months. They knew who was in the house. They had an expectation of what they were going to find. Earlier, I think it was two months earlier, Mr. Flores had gotten into a car chase with law enforcement officers, abandoned the car, they got a search warrant for the car, and found guns. So they knew that there was going to be guns, there's going to be possibly drugs in this house. This was basically a search under the guise of a protected suite. Why do you need 20 officers at this location? Why do you need 10 to go in when you know that there's at least two people? And this goes beyond just officer's hunch. They can identify that it's okay, we know that the woman who came out, we know that she's a sister of, I think it was Franklin Pena Casares, she's a sister of one of the Franklins. So they already had that information going in. They knew that Franklin Hernandez was a close associate of Mr. Flores. So the government has to prove at the district court level that that search did not exceed the scope of the protected suite. Once they found the two Franklins in the upstairs bedroom, that should have been it. We didn't hear any testimony about how specifically the search was conducted, where did these officers go, what rooms did they go in first, you know, was the gun and the magazine, was that found at the same time that the Franklins were found, or was that found after the Franklins were being removed from the house? Thank you, Your Honor. Thank you, Counsel. Your Honor, unless there's any specific questions, I'll talk a little bit about the plain error standard. Although I would argue that abuse of discretion applies, I think plain error would be easily satisfied here, even if it did apply. That would just require that there be an actual legal error. I think turning a blind eye to a very serious issue or not addressing a very serious issue during void year is a legal error. I think it's obvious in the sense that this is addressing something as just an ordinary opinion or bias rather than addressing it as fear. To be clear and obvious, don't you have to point us to some Sixth Circuit case that tells us that this, what happened was a problem? Assuming that's the case, what case are you pointing us to? Well, I think that there really isn't a Sixth Circuit case, and there's hardly any cases that discuss fear. I have the Seventh Circuit case, which I think is a published case in the Seventh Circuit, which discusses the Blitch case, which discusses how this needs to be handled pursuant to the Sixth Amendment. I know that's not binding, of course, but I think it's very persuasive. I think that the reasoning makes sense that the void year process is this investigative process that is designed to make sure the Sixth Amendment is complied with. If that's not done, I think that makes this clear and obvious. Fear is contagious. If someone is terrified, then the person next to them is likely going to be affected. They're going to feel that. And if those people are sitting in judgment of someone, they're losing sleep, they're describing intimidation that they've heard from other jurors, they're hearing about autopsy photos and seeing that, they may have a personal stake in the verdict and they may feel they need to convict because that's what it takes to keep them safe. And it might not be logical, it might just be the feeling that I need to convict. So that juror would not be indifferent. Of course, this affects substantial rights. It affects the Fifth and Sixth Amendments. And there's a reasonable probability, I think, that this could have affected the outcome of the case. Of course, we don't have transcripts from the jury room. But it also seriously affects fairness and integrity and reputation, all of those things. So I think even if plain error did apply, failing to address stated fear and making sure the other jurors don't feel the same way, I think is a plain error. So I think under any standard, this would be satisfied. Thank you. Unless any other questions, that's all I have. Thank you. Thank you. Your Honors, I would respectfully disagree with the government and submit that the overwhelming evidence in this case really depends on the evidence. And one of the problems is that not a single one of this trifecta that I talked about earlier witnessed the actual killing of Liliana Rodriguez. The three gentlemen that they brought in, these were their key witnesses. And these are the only witnesses that implicated my client in these two murders. One of those murders, none of those gentlemen witnessed. And this court has stated in Boggs v. Brigano, that's 82 F. 3rd 417, that impeachment by contradiction is an allowable practice where the matter raised is non-collateral. Respectfully submit that this matter and this witness and the generalities that this witness made while on the stand about not being an MS-13 member anymore and being afraid and being sympathetic swayed this jury. Assuming there's an error, how do you overcome the harmless error argument that the government is raising? Well, the government speaks in broad terms about the overwhelming weight of the evidence, but the only way this court may arrive at that is to look to see what that really constitutes. And it's two other witnesses, Your Honor. It's just two other witnesses, and they're both cooperators. We're not talking about excluding his testimony entirely, that didn't happen. We're talking about the delta between the testimony he was allowed to render and the believability of that testimony if this particular impeachment evidence from the prison had come in. And so on that score, was he not cross-examined about his violent acts in MS-13? And to put it in short, the cross-examination didn't make him look like a very sympathetic guy. And so how do we think about that in the role of this testimony? Well, and of course this is all about what moves the dial, Your Honor, and how far this particular impeachment by contradiction would move the dial. And respectfully, I believe it would have moved it quite significantly, especially since this was just one of three witnesses who testified about these two murders. I believe that the failure here undermines our confidence in this jury verdict because we have, and certainly implicates the constitutional right to a fair trial of my client in that we have an error by the district court that did not allow my client to fully develop his case and put on witnesses in his defense and impeach by contradiction a critical, critical witness. I can't understate how critical Mr. Baca is in this case and for those reasons that the error is not harmless. Thank you, counsel.